MILLER et al. v. PENNEY et al.

No. 119.

District Court, W. D. Missouri, W. D.

May 12, 1948.

Richard L. Douglas and Robert A. Brown, Jr., both of St. Joseph, Mo., and Craig Van Meter, Fred H. Kelly, Robert M. Werden, and Jack E. Horsley, all of Mattoon, Ill., for plaintiffs.

Brewster, Brewster & Brewster, by R. R. Brewster, Jr., and W. B. Brewster, all of Kansas City, Mo., for defendants.

DUNCAN, District Judge.

This is a bull case, and I sincerely regret that I agreed to decide it rather than to have it tried before a jury composed of stockmen and farmers who through experience would have been more familiar

with the commercial "love life" of a "blooded" bull than I.

While my youth was spent in rather close association with bulls, they were not the kind involved here. They were common, plebian bulls which at this time of the year roamed the woods and fields and walked the fence rows, challenging with low growling moans or shrill bellows every animate or inanimate object. They were bulls which pawed the dirt and rolled their heads in impassioned, frenzied wrath that knew no bounds and respected no normal enclosure. But Eileenmere 627th, No. 735647, is an aristocrat of the kine world, a product of this age of high prices.

Eileenmere 627th was born in the stable of luxury and raised in the field of plenty. With a long line of champions as his ancestors, he was destined from the day he was calved to follow in the hoofsteps of his illustrious progenitors. In this respect, at least, he did not disappoint his "fitters" (a term applied to those who prepare bulls for the show ring). Before he was two years old he had traversed the "circuit," appearing in twelve shows. Eleven times he was acclaimed as Grand Champion and the twelfth time as champion of his class. This is no mean record where competition in glamour and other bullish qualities, obscure to the uninitiated, is so pronounced as it is in the world of show bulls. Finally having won his laurels as a great star in the show ring, he attracted by his reputation the "big money" buyers. After this was accomplished, he, like most others of his kind, was removed from the tinselled surroundings of the show world and returned to his home that he might bring to the enjoyment of his owners the fruits of his success. There was "fitted" for the public auction "ring" and his fate committed to the chanting voice of the auctioneer. The public auction is the customary method of introducing, for a price, this type of bull to the society of breeders. When he was placed upon the auction block in his native State of Illinois, the auctioneer "knocked him off" for $10,600. He was then transported across the state line and delivered into the green pastures of his new home in the State of Missouri. Thus

the jurisdictional requirement of this court was satisfied.

He was touted as the great son of a noble sire and heralded far and wide as the outstanding "Star of the Year" and the new Junior Sire of an equally aristocratic herd of Aberdeen-Angus cows and heifers. But, alas, while his meretricious charms made him a champion in the show ring, they were unavailing in the mating pen. The cruel hand of fate had destined the great Eileenmere 627th, 735647, to be a celibate. Never could he become the proud Junior Sire of so noble a herd, with ambitious visions no doubt of becoming, in time, a prouder Senior Sire; never would he know the proud, chest-expanding pride of seeing his own flesh and blood walk the green pastures among a herd over which he would majestically preside. There would be no Eileenmere 628th. Because of defective hind quarters and genital defects he was physically unable to perform the mating act, which nature intended should result in reproduction. He was worthless for the purpose for which he was purchased. Seriously, it is distressing to ponder the ultimate fate of so noble an animal.

Plaintiffs are partners engaged in the breeding and sale of Aberdeen-Angus cattle near Arcola, Illinois. Defendants are a partnership engaged in like business at Hamilton, Missouri.

Sometime prior to the first day of April 1946, plaintiffs advertised an auction sale to sell a large part, if not all, of their stock. This sale was advertised by catalogue as "Miller Brothers' sale of Aberdeen-Angus cattle," giving the name, description, pedigree and registration number of the eight bulls and seventy cows offered for sale. Apparently this was in accordance with the custom among breeders and sellers of this type of pedigreed animal.

Eileenmere 627th was sired by Eileenmere 487th on the farm of J. Garritt Tolan, one of the outstanding Aberdeen-Angus breeders in the United States; and when still a calf was consigned to sale at public auction and purchased by the Miller Brothers. Thereafter he was turned over to Ben Casebier, a breeder of Aberdeen-An-

gus cattle and a recognized handler and fitter of cattle for show purposes. The bull was shown through the season of 1943 winning the prizes enumerated before. Thereafter he was returned to the Miller Brothers farm where he was kept during the winter of 1945 and prepared for the auction sale on April 1, 1946.

Pursuant to a written request, J. C. Penney, who maintains his home at White Plains, New York, received a copy of the sales catalogue. Being the owner of Eileenmere 487th, the sire of Eileenmere 627th, Penney was interested in the purchase of Eileenmere 627th. Apparently all sales are conducted under fixed rules adhered to by all members of the Aberdeen-Angus Association. The terms of the Miller Brothers' sale as set out in the catalogue were in accordance with the universal and well recognized warranty with respect to all animals sold at such public auctions. The conditions were:

"Each animal will be sold to the highest bidder without reserve. The auctioneer will settle any disputes as to bids by declaring all bids off and reselling the animal in question. Each animal will be at purchaser's risk as soon as sold, and will be delivered on board truck or railroad car at the station as the buyer instructs, as soon as settlement is made. Each animal will be fed and cared for free of charge to the purchaser until shipped by railroad or truck within a reasonable time.

"Each animal will have a health certificate showing that it has passed a test for Bang's disease and tuberculosis within thirty days of sale.

"All animals of breeding age are guaranteed breeders. Females in calf or with calf at foot are considered breeders without further guarantee. All untried animals are guaranteed to be without known defect but nothing further. Bulls are guaranteed breeders, if properly cared for and not used until sixteen months old. Animals failing to breed after six months trial may be returned to the farm of the seller at buyer's expense, for a trial period of six months, after which time if animal proves to be a non-breeder, a satisfactory exchange for animal of equal quality or cash settlement will be made. Cows or heifers reported as served are believed to be in calf but are not so guaranteed. All claims for adjustment must be made in writing within ninety days of sale."

On the date of the sale defendant James, whose home is approximately 300 miles from that of the Miller Brothers, arrived at the Miller home and inspected Eileenmere 627th. This was at about 10:30 a. m. prior to the beginning of the sale at noon. At the time he first saw the bull, it was tied up in a stall and standing in hay a foot deep. James discovered that the bull's hoofs were quite long, not having been trimmed as is customary with respect to show stock. The hoofs had been permitted to grow and turn under, interfering considerably with the normal walking ability of the bull. This, however, was a matter that could be readily remedied by trimming the hoofs. James was alone when he inspected the bull. The inspection disclosed, in his opinion, that the bull's hind quarters were abnormal, that either one hip was enlarged or the other was shrunken. This caused James some concern, and he called it to the attention of Roy G. Johnson, one of the auctioneers. Because of James' concern over the condition, Johnson called together the Miller brothers and some other persons, and the matter was discussed. The Miller brothers were unwilling to admit that there were any apparent defects in the bull's hind quarters. Tolan was apparently the leader in the discussion. He was president of the Aberdeen-Angus Association. Not only was he one of the largest breeders of Aberdeen-Angus cattle, but he was also recognized as the dean of the Association's membership. In view of James' feeling that there was something wrong with the bull's hind quarters, Tolan made the suggestion that the Miller brothers give James a warranty that the condition of the hip would not interfere with use of the bull for breeding purposes for one year subsequent to his purchase should James become the purchaser, and further that this warranty be put in writing. With this understanding James purchased the bull for $10,600. While the terms of the sale as advertised in the catalogue were for cash and all settlements were to be made immediately

890

after the close of the sale, this provision was waived by the sellers, who stated prior to the sale that if James wished to pay for the bull at a sale to be held by defendants on April 18th, that would be satisfactory to them. As a result of this understanding the bull was not paid for when purchased. One other condition of the sale was waived. The terms of the sale provided:

"Each animal will be at purchaser's risk as soon as sold, and will be delivered on board truck or railroad car at the station as the buyer instructs, as soon as settlement is made. Each animal will be fed and cared for free of charge to the purchaser until shipped by railroad or truck within a reasonable time."

After the sale, at the request of the purchaser, the sellers agreed to deliver the bull at their expense to the Penney-James farm in Missouri. The bull was delivered by truck by one of the plaintiffs, Loyd Miller, on the 6th day of April 1946. On arrival the bull was unloaded by Miller and David Luckett, the Penney-James head herdsman, in the presence of Dr. Logan, a veterinarian at St. Joseph, Missouri. Almost immediately the bull was secured in stocks and a strip of canvas was placed beneath his body extending from his front legs to his hind legs, to which was attached a derrick, and he was raised until his feet barely touched the ground, and Dr. Logan, in the presence of James, Miller and the head herdsman secured and trimmed his hoofs. The bull struggled to some extent during the trimming, but after his release he displayed no apparent ill-effects. On the contrary the parties agreed that the bull walked much better. In the evening after the bull was delivered, James and Miller went to the office of James' lawyer at Hamilton, Missouri, where a written agreement purporting to embrace the warranty made prior to the purchase of the bull was drawn up. A copy of this agreement was given to Miller who took it with him to Illinois. It was never signed by the Miller brothers because they contended that it did not embrace the original oral agreement. With this contention I concur. The proposed written warranty was broader than the oral one.

Miller returned to Illinois on the 7th day of April. On the following day James and

his herdsmen attempted to breed a cow to the bull. The evidence shows that the bull was physically unable to mount the cow, that his hind quarters were too weak to enable him to mount, that he placed his nose or head on the cow's rump and attempted to raise himself but was unable to raise his front legs more than six inches off the ground. Between that date and the 18th of April several attempts were made to breed cows of different sizes to the bull. Each attempt was met with the same effort on the part of the bull. According to the testimony there were defects in the genitalia of the bull which also would have prevented his breeding. This, however, will be discussed later. A number of persons testified that they witnessed efforts to breed cows to the bull and his inability to accomplish or perform the act.

On April 18th James and Penney conducted a sale for the purpose of disposing of certain of their Aberdeen-Angus cattle. One of the plaintiffs attended that sale. At that time Penney discussed with Miller the inability of the bull to mount and cover a cow, rescinded the sale, and offered to return the bull to Miller. Miller declined to receive the bull. Thereafter Penney by letter again notified plaintiffs of the efforts of defendants to breed cows to the bull and of his physical inability to accomplish his desired act. Penney declined to pay for the bull and the Miller brothers declined to accept his return. This action was brought for the agreed purchase price. The defendants' counterclaim for damages is, in part, as follows:

"7. That defendants thereupon attempted to breed their cows and heifers to said bull but that said bull did not and could not service any of said cows or heifers presented to it for service.

"8. That immediately upon discovery that said bull did not and could not service the cows or heifers presented for said service the defendants employed veterinarians to examine and treat said bull and thereby incurred large expense; that in the feeding, sheltering and medical care of said bull the defendants expended in excess of Two Thousand ($2,000.00) Dollars.

"9. That defendants, immediately upon discovering that said bull failed to service

cattle presented to it, notified plaintiffs of said failure and tendered said bull to plaintiffs; but that plaintiffs at all times refused to accept the return of said bull; but on the other hand, demanded payment therefor, knowing at the time that said bull was worthless as a breeder and incapable of reproduction.

"10. Defendants state that by reason of plaintiffs' wilful and fraudulent misrepresentations, guaranties and warranties and the wrongful, wilful and malicious refusal to accept the return of said bull, defendants have been damaged as set out in Paragraph 8 hereof in the sum of Two Thousand ($2,000.00) Dollars; that by reason of said wrongful, wilful and fraudulent misrepresentations the defendants have further been damaged by losing the increase from cattle presented to said bull for service; that said loss of the increase amounts to a sum in excess of Five Thousand ($5,000.00) Dollars; that the actual damages suffered by the defendants exceed the sum of Seven Thousand ($7,000.00) Dollars and that in addition thereto the defendants are entitled to recover punitive or exemplary damages in the sum of Five Thousand ($5,000.00) Dollars.

"Wherefore, defendants pray for judgment on this counterclaim for Seven Thousand ($7,000.00) Dollars actual damages and for Five Thousand ($5,000.00) Dollars punitive damages, and for their costs herein."

The undisputed evidence shows that subsequent to the delivery of the bull to the Penney-James farm, numerous efforts were made over a considerable period of time to breed the bull to various types of cows, even resorting to what is called "pit breeding." Every effort was unsuccessful.

Plaintiffs insist that at the time the bull was sold he was a known breeder in accordance with the terms of the warranty that "bulls are guaranteed breeders if properly cared for and not used until 16 months old." This bull was older than that. The witness Casebier testified that he bred one cow to the bull and that the cow had a calf. Plaintiff Loyd Miller testified that he bred 11 or 12 cows to the bull during the time they had him on the farm and that he produced five calves which were registered with the Aberdeen-Angus As-

sociation. Miller stated he bred a cow to him as late as February 18th prior to the sale on April 1st. Plaintiffs contend that there was no defect in the bull's hind quarters nor any other defect at the time of his sale, that during the time they had him he was a known and recognized breeder, that he conformed to all the requirements of the warranty, and that if the bull had any defects they were caused by some condition occurring subsequent to his delivery to the Penney-James farm. They further insist that the bull was too fat for breeding purposes and that his weight, estimated at from 1,650 to 1,800 pounds, was several hundred pounds in excess of the weight which a bull of his size and type should carry if he is to be used for breeding, and that if he was unable to mount a cow it was probably attributable to this condition rather than to any physical defects. It seems to me, however, that this argument is refuted by plaintiffs' own testimony that they bred a cow to this bull 48 days before the sale, and that at that time he functioned and performed in a normal, natural way with no indications of any defects. It seems hardly probable that within that period of time the bull would have so increased in weight as to be unable even to mount a cow. There can be no dispute that at the time of the trial the bull was useless for breeding purposes. Plaintiffs insist, however, that the bull was all right when he was sold and that he was probably injured by the hoisting process used at the time his hoofs were trimmed.

In October following his delivery in April the bull was examined by several veterinarians. His paunch or stomach had slipped to the right so noticeably that one person testified that he stood in the shape of a rainbow. The examination disclosed the presence of a fibrous growth that reduced or cut off the flow of blood to the genitalia causing a trophy of the bull's reproductive organs. Scar tissue was found in the urethra channel. This tissue prevented the bull from extending his penis more than six or seven inches. This would have prevented his performing the sexual act had he been able to mount the cow. One doctor testified that the penis was deformed, that in his opinion the deformity was congenital, and that the bull had never

been physically able to breed or serve a cow. The warranty in the catalogue provided that "animals failing to breed after six months' trial may be returned to the farm of the seller at the buyer's expense for a trial period of six months * * *." Defendants did not attempt to rescind the sale under that warranty but attempted to rescind the sale under the collateral warranty given on the day of the sale. The question of nonliability of defendants must be approached through the collateral special warranty rather than through the warranty contained in the catalogue. If the warranty in the catalogue applied, then defendants would be liable because they did not comply with the provisions of the warranty requiring test periods to determine the ability of the bull to breed. The defendants rescinded immediately upon determining that the condition of the bull's hips prevented his mounting a cow. This was the condition which the collateral warranty covered. It is doubtful, however, whether the general warranty, which required a year to determine whether a bull was a breeder, was intended to apply where the failure to breed was due not to sterility or failure to "get calves" but to impotence resulting from deformity or atrophy of the genitalia. In the case of suspected sterility or failure to "get calves" it would be necessary to determine whether the fault rested with the bull or the cow, whether the sterility was temporary or permanent. That would require time and testing under different conditions. In the case of impotence the cause of the failure to breed would be obvious, and nothing would be proved or gained by demanding useless and futile tests over a period of a year. However, it is not necessary to determine that question here as defendants had no knowledge of such defects or deformities if they existed at the time they refused to pay for the bull and sought to rescind the sale. Defendants rescinded solely on the basis of the collateral warranty, and on that their case stands or falls.

■ Plaintiffs insist that the collateral oral warranty is invalid as being an attempt to vary by parol the written warranty in the sale catalogue. I am unable to agree. It does not vary the terms of the written warranty. It was a separate warranty made to cover a situation not covered by any warranty in the terms of the sale; it was a warranty which would ordinarily not have been made by the seller or included in the terms of the sale. While it was agreed that the warranty should be put in writing, the failure to do so does not nullify its terms in the absence of any showing that the parties intended not to be bound until such writing was made. On the contrary defendants bid on and purchased the bull on the strength of the oral warranty, clearly indicating that they considered it effective at the time of the sale.

■ I believe that the condition from which the bull admittedly is suffering was present at the time the bull was sold. It may not have been noticeable to plaintiffs without the close inspection made by defendant James. I am constrained to believe that the bull was unable to mount a cow two days after he was delivered to defendants' farm and six days after he was sold. It is unreasonable to believe that if the bull had been in good physical condition at the time of the sale, his condition could have so rapidly changed, particularly in view of the subsequently discovered fibrous growth that had atrophied his genitalia. Defendants had no use for the bull except as a breeder. Although the purchase price seems to be considerable, comparatively it was not; and defendant James felt that if he could get a year's service from the bull, he would be justified in paying the price he agreed to pay. This was a factor which induced the giving of the collateral warranty. Since the bull was incapable of mounting a cow, and hence incapable of breeding, defendants were justified in rescinding the sale on the basis of the collateral warranty. Having rescinded they were not obligated to pay the purchase price.

■ Defendants seek to recover the sum of $12,000 in actual and punitive damages as set out in their counterclaim. This includes $2,000 for shelter and medical care, $5,000 for the loss of increase from cattle presented to the bull for service, and $5,000 in punitive damages. There is no evidence indicating any loss of increase from cattle presented to the bull for serv-

ice. In fact, the evidence shows that shortly after defendants learned of the inability of the bull to mount, they purchased another bull from J. Garritt Tolan. Nor is there any evidence of wilfulness, maliciousness, or fraud in inducing defendants to purchase the bull. The issues must, therefore, be found against defendants on their counterclaim for punitive damages and for damages for loss of increase of cattle.

The other claim for shelter and medical care presents a different problem. At the trial defendants estimated at $1,418.48 their costs in caring for the bull. This included sums expended for feed, straw, and physical care. This amount is excessive. Under the circumstances in this case the bull did not merit the luxurious maintenance he received. He was given the same care and consideration given to bulls kept for breeding when it was patent that he was not a breeder. Defendants say that had the bull not been well cared for plaintiffs would have complained that the bull's failure to breed was due to defendants' neglect. In view of the evidence that the bull never could or would be a breeder, defendants were not justified in maintaining the bull in the extravagant manner in which he was maintained. I think $750 is adequate. No testimony was given concerning the cost of medical attention. The court is, therefore, limited to what the court feels is reasonable for care and feeding of the bull. It is my view that $750 is a reasonable amount for that care.